MISSISSIPPI PUBLIC SERVICE Co. *et al.* v. SCOTT.

(Division A.   May 31, 1937.)

[174 So. 573.   No. 32501.]

**Leftwich & Tubb**, of Aberdeen, for appellant, Ray Hood.

Thomas J. Tubb, of West Point, for appellant, Missis-sippi Public Service Company.

**Paine & Paine,** of Aberdeen, for appellee.

Argued orally by **C. L. Tubb** and **Thos. J. Tubb**, for appellant, and by **Thos. F. Paine**, for appellee.

**McGowen, J.,** delivered the opinion of the court.

Scott, the appellee, brought this action in the circuit court of Monroe county against T. R. Schumpert, Irby Lee Puckett, Ray Hood, and the Mississippi Public Service Company, seeking a recovery of damages for personal injuries received by him in an automobile truck accident. The appellee recovered a judgment for $10,-000 against Schumpert, Hood, and the Mississippi Public Service Company, from which Hood and the Mississippi Public Service Company prosecute this appeal.

We will eliminate a statement of the pleadings, as we think a statement of the facts at issue will be sufficient for an understanding of the case.

On December 1, 1934, appellee Scott was riding in a motortruck, returning from Aberdeen, Miss., north via Amory, to his home in Detroit, Ala. The truck on which he was riding was owned by his brother, O. T. Scott, and was being driven by the fifteen year old son of O. T. Scott. The owner, the driver, and a Mr. Collier were on the front seat of the truck; there was no cab; and the appellee was standing in the bed of the truck at the rear of the seat. A trailer heavily laden with more than 7,000 pounds of hay was attached to the truck. When this truck had proceeded north some miles on Highway No. 25, and was just about to pass off the north end of the bridge across Weaver's creek, it collided with a truck being driven south by Ray Hood; the Hood truck also had a trailer attached which was equally heavily

laden with iron gas pipes. The bridge was 167 feet long, the southern part was of wood, 90 feet long, the middle span was of steel, 50 feet long, and the northern part was of wood, 27 feet long; it was 16 feet wide between the banister rails, and on the floor on each side were 4x4 beams adjoining the banisters; runways for one automobile's use at the time were laid on the southern part of the bridge but, according to some of the evidence, not on the center span nor on the northern end thereof. There was a conflict, however, as to whether these runways extended the entire length of the bridge. The Scott truck was 8 feet wide, including the hay, and the other truck was slightly narrower. The drivers and owners of both trucks were familiar with the bridge at this point. The highway leading from the north end of the bridge curves toward the east for some distance. While the Scott truck was on the southern portion of the bridge, the passengers thereon saw the Hood truck being driven rapidly toward the bridge. Witnesses estimated that the Hood truck was being driven at a speed of 35 to 40 miles an hour. Scott and his witnesses testified that about the time their truck left the steel span of the bridge they thought Hood was slowing down for them to complete the trip over the bridge, but when they saw he was coming on they "blew the whistle and hollered;" that they were driving very slowly; and that the truck driven by Hood came on the bridge rapidly and collided with the Scott truck about 8 or 12 feet from the northern end of the bridge and on the east side thereof. The appellee said that when he saw that Hood was not going to give the hay truck the right of way there was nothing he could do.

Many witnesses testified for the appellee that the collision occurred about sundown. Scott did not have the lights of his truck burning. The witnesses who removed Scott from the wreckage testified that they carried him on the east side of the bridge and that they

could barely get between the Hood truck and trailer and the banister of the bridge. Several witnesses expressed the opinion that had the Hood truck continued without collision the trailer containing the iron pipe would have struck the east banister of the bridge. Scott was thrown down in the truck and the hay fell upon him; at the hospital it developed that he had a complete fracture of the bones in the lower part of both legs, his knees were injured, his body crushed and bruised, and he contended that his stomach and kidneys were badly injured. He remained in bed for nearly ten months before he was able to get out on crutches, one of his knees is permanently stiff, and at the trial he was unable to stand for any length of time and was unable to use the stiff knee. He suffered great pain; had the constant attention of a physician, and had to be carried to him many times for treatment.

Hood testified that he did not leave Amory with his load of pipe until after 5 o'clock in the afternoon; that it was a cloudy day; and that the lights on his truck were burning, but they did not shine around the curve onto the Scott truck until he was a short distance away from it, and as the Scott truck had no lights and the color of the hay blended with the trees, he did not see it in time to stop his truck before the collision. The record shows that Hood was driving upgrade when he came upon the bridge, while the Scott truck was descending the same grade. Hood also testified that the Scott truck was being driven slowly when he first saw it; he and his witnesses contended that the collision occurred within one foot of the left, or west, banister of the bridge, so close in fact that a man could barely walk between it and the hay truck. Quite a number of witnesses testified that the Weaver's creek bridge was a one-way bridge, some that it was a one-way bridge for trucks, and some that they had driven over it and met cars and been able to pass in safety. Some of the witnesses for

appellants testified that the two trucks could have passed each other but there would have been a collision of the trailers, in which event perhaps less damage would have ensued.

The appellants offered evidence that one of the lights on the Scott truck had no bulb, and a sack was tied over the reflector. The mechanic who examined it the next morning said that it had no bulb, but witnesses for the appellee tesified that the sack was tied over the light to protect the bulb from dust, because the lens was broken, and that the sack could be taken off and the light used effectively when necessary. There was sharp conflict on all the issues of fact.

Hood testified that he did not know by whom he was employed; that his truck was usually loaded by several men at Amory with gas pipes and he proceeded to a point beyond Aberdeen and there his truck was unloaded by other men; that he was paid $1.20 an hour for the use of his truck and 20 cents an hour as driver. He admitted that he testified on a former trial that he was employed and paid by the Mississippi Public Service Company. It seems clear that Hood received payment for the rental of his truck from Schumpert, and that Schumpert received $1.50 an hour from the Mississippi Public Service Company to furnish trucks and teams.

De Spain, called as an adverse witness by the appellee, testified that he was superintendent and had general management of the Mississippi Public Service Company; that the company was engaged in distributing gas to consumers from the Amory wells; that the supply of gas was failing, and it desired to connect its pipe lines with those of another gas company at a point near West Point, so as to be able to continue the distribution of gas to its customers; that his company condemned the lands on which the pipes were to be laid in ditches; that it paid for the labor, material, and rental of certain machinery necessary to the welding of the pipes and com-

pleting the pipe line. Quite a number of pay rolls of Hood and others, made out on the appellant company's stationery, signed by McPhail, were identified by De Spain as having been paid by him, and were offered in evidence. It is undisputed that the gas line was constructed for the benefit of the appellant company. De Spain also testified that the weekly bills for labor were paid on the orders of agents and employees of Ford, Bacon & Davis, a construction company which had a cost-plus contract with his company; that the contract had been entered into orally by the representatives of the gas company and the construction company at a time when he was not present; that the contract had been made in New York by two superior officers of the two companies; that the construction company had control of expert labor necessary for the particular construction work. When he undertook to detail the contents of the contract, the court excluded the evidence on the ground that it was hearsay. He further testified that Schumpert had a contract with the construction company and not with him to furnish the trucks and drivers, although he made the contract with Schumpert and carried the names of the truck drivers on the books of his company. Schumpert did not appear at the trial and could not be had upon process on behalf of the appellee; therefore the nature of his contract with the construction company is not revealed. De Spain also testified that his company had paid about $100,000 on the pipe line, although the contract was not in writing. While DeSpain was being examined as an adverse witness, appellee's counsel asked him the following question:

"Also is it not a fact, Mr. DeSpain, that you required liability, public liability, insurance, to cover every man that was engaged in that work?

"The Court: Take the jury out at this time (Jury retired) A. Yes, we later got contract signed by all

drivers that they were carrying insurance on their truck, each respective truck driver.

"Q. Including Mr. Hood here, one of these defendants? A. Yes, I think Mr. Hood signed one, I am not sure, I am quite sure Mr. Schumpert did, not sure about Hood."

He further testified that he did not think his company took additional insurance for this particular job; that it had the overwriter clause that every company carried. In the absence of the jury, the evidence was objected to, the court excluded it, and the record shows that a mistrial was asked because of the quoted question propounded by counsel for the appellee. The court overruled the motion for a mistrial, but said that to instruct the jury not to consider the question would accentuate the matter, and the probability was that the jury did not know what it was all about.

1. It is contended by both Hood and the Mississippi Public Service Company that the court erred in not ordering a mistrial because of the question propounded by counsel for appellee as to insurance. The court promptly ordered the jury to retire and heard the evidence relative to this question of insurance, and excluded it, in the absence of the jury. This court had held that where the evidence shows that a company, charged to be the principal, requires liability insurance of an employee, then the representatives of the company may be interrogated, as that testimony may be of some value in establishing the relation of principal and agent. See Finkbine Lumber Co. v. Cunningham, 101 Miss. 292, 57 So. 916; Pan-American Petroleum Corporation v. Pate, 157 Miss. 822, 126 So. 480, 128 So. 870. We are not called on to say here whether this evidence was competent or not, but we will say that the question here could not possibly have prejudiced the appellants. It might have been better had the court instructed the jury not to consider the question. To say the least, the ques-

tion of the competency of the evidence is in very grave doubt, viewing it most strongly from the standpoint of the appellants.

2. Hood insists that there is no liability on his part, and that the court erred in not granting him a peremptory instruction. Whether Hood had his lights burning at and before the time of the collision was in controversy; in truth, every material fact is in controersy. In our opinion, if he was driving rapidly around a curve, was familiar with the bridge and the width thereof, it was entirely within the province of the jury to say that he was guilty of negligence in not having his truck under control in the event another car should be approaching him on the bridge. Under the circumstances of the case, the jury was warranted in believing that he knew the bridge was a one-way bridge, and the duty was upon him before going upon it to ascertain whether or not he would meet an oncoming vehicle. The jury was warranted in finding either that his lights were burning or not, and if they were not burning, then the jury was warranted in finding that he was approaching the bridge in the night at a time when he could not see, without exercising that reasonable care which is required of every motorist approaching a place of public danger. Whether it was more than half an hour after sunset or not, the jury was warranted in concluding that Hood did not have his truck under control at and just before the time he started to go upon the bridge. On these facts Hood was certainly not entitled to a peremptory instruction, and the evidence is very persuasive, if not conclusive, that he was negligent on that occasion.

On the argument that Hood was entitled to a peremptory instruction because the evidence tended to prove that the Scott truck was being driven on the west, or wrong, side of the bridge, we think this was a question of fact, and we cannot invade the province of the

jury as to which side of the bridge the collision occurred. If it was a one-way bridge, then the position of Scott's truck was immaterial.

3. It is insisted on behalf of the appellant Mississippi Public Service Company that the court erred in refusing a peremptory instruction requested by it, because the evidence shows that Hood was not its employee, agent, or servant, but served an independent contractor for whom the company was not responsible. In other words, that Hood was the servant of either Ford, Bacon & Davis, or Schumpert, and that these occupied the relation of independent contractors to the appellant company. The burden of proof was on the appellant company to show facts establishing the relation of independent contractor as to either the construction company or Hood. Where the evidence shows that the employee was working on the defendant's premises and that the work was for the benefit of that defendant and in his interest, then such employee is prima facie a servant of such employer. 14 R. C. L. 78, par. 15. The jury was warranted here in adopting the implication that Hood was the servant of the Mississippi Public Service Company. Let it be remembered that this proof shows that the work here in question was being done for the appellant company, that it was in its interest, that it was emergency work, and that the company carried the names of the truck drivers on its books and paid for their services on receipt of weekly statements rendered on its stationery and signed by a person who is claimed by the appellant company to be a servant of an independent contractor. The only way the appellant company undertook to establish an independent contract was by offering De Spain's testimony as to what his superior officers had told him were the terms of the contract. It would have been so easy for the appellant company to have produced its officer who made the contract, or have had his deposition at least. It chose not so to do.

As to the claim that Schumpert or Ford, Bacon & Davis were independent contractors, we are of the opinion that the appellee made out a prima facie case that the appellant company was Hood's principal or master, and only the terms of the oral contract would have been sufficient to overcome such. For aught we know, the construction company and the appellant company may have entered into a contract by which the former assumed no liability or responsibility in the matter of this construction work. The fact is that under the undisputed proof in this case the construction company did not furnish the instrumentalities with which the work was done, but the appellant company rented the machinery, thereby implying its control over all these instrumentalities. So far as Schumpert is concerned, the most that is shown is that he received 10 cents an hour for each truck and driver which he procured to render services ultimately beneficial to the appellant company. The record does not show that he exercised any control whatever over any of these truck drivers.

The case of McDonald v. Hall-Neely Lumber Co., 165 Miss. 143, 147 So. 315, has no application to the facts here.

Insofar as the instructions are concerned, we find no reversible error, nor do we find any in the general conduct of the trial.

Affirmed.